THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8
9
10
11
12
13
14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PUGET SOUNDKEEPER ALLIANCE, a
non-profit corporation

                    Plaintiff,

        v.

BNSF RAILWAY COMPANY,

                    Defendant.

CASE NO. C09-1087-JCC

ORDER

15   This matter comes before the Court on Plaintiff's motions[1] for summary judgment (Dkt.

16   Nos. 72, 73), Defendant's response (Dkt. No. 82), and Plaintiff's reply (Dkt. No. 88.). Having

17   thoroughly considered the parties' briefing and the relevant record, the Court grants the first

18   motion and grants in part and denies in part the second motion for the reasons explained herein.

19   **I.    BACKGROUND**

20        Defendant owns and operates a railroad-transportation facility in the Interbay neighborhood

21
22        [1] Local Rule 7(e)(3) states: "Motions for summary judgment . . . shall not exceed twenty-
23   four pages. . . . The filing of multiple dispositive motions to avoid the page limits of this rule is
     strongly discouraged and successive motions may be stricken." Plaintiff filed two successive
24   motions for summary judgment, each containing twenty-five substantive pages and totaling fifty
     substantive pages. (Dkt. Nos. 72, 73.) However, Plaintiff did not file a motion requesting
25   permission to file an over-length motion. The Court is inclined to strike both motions. However,
     due to the impending trial date, the Court will not do so. However, Plaintiff is warned against
26   such flagrant disregard of the local rules in the future.

of Seattle, Washington. (Dkt. No. 44 at 4.) Plaintiff, an environmental nonprofit organization

dedicated to tracking down and stopping the discharge of toxic pollutants into the Puget Sound,

alleges that Defendant violated the Clean Water Act (CWA) by discharging pollutants into the

navigable surface waters of the state. (*Id.* at 3, 8.) The Court discusses Plaintiffs' claims and

allegations, as well as the underlying statutory structure, in detail in its previous order. (*See* Dkt. No.

43.)

## II.   DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of the law." Fed. R. Civ. P. 56(a). A

defendant is entitled to move for summary judgment by alleging that the nonmoving party has

failed to make a sufficient showing on an essential element of his or her case. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1985). To overcome such a motion, the plaintiff bears the burden of

producing evidence with respect to the identified element; the plaintiff's response must set out

specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2). "One of the

principal purposes of the summary-judgment rule is to isolate and dispose of factually

unsupported claims or defenses." *Celotex*, 477 U.S. at 323.

### A.   Unpermitted Discharges

Plaintiff requests that the Court grant summary judgment finding that Defendant violated

section 301(a) of the CWA, 33 U.S.C. § 1311(a) by discharging stormwater associated with

industrial activity since November 3, 2009, and that these violations occurred on seventy-eight

specific dates. (*See* Dkt. No. 72.) Defendant admits these violations and concedes that the Court

should grant Plaintiff's motion. (Dkt. No. 82 at 6.) Accordingly, the Court grants Plaintiff

summary judgment that Defendant violated section 301(a) of the CWA by discharging

stormwater associated with industrial activities from its Balmer Yard on the seventy-eight days

specified in Plaintiff's motion. However, the Court does not at this time determine the amount of

penalty to be imposed for those violations.

1    **B.     NPDES Permit Violations**

2         Plaintiff also moves for summary judgment finding that Defendant violated sections

3    301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342, by violating the terms of its National

4    Pollutant Discharge Elimination System (NPDES) permit. (*See* Dkt. No. 73.)

5              **1.   2001 Stormwater Pollution Prevention Plan**

6         Plaintiff alleges that Defendant's 2001 Stormwater Pollution Prevention Plan (SWPPP)

7    failed to comply with the 2002 General Permit for a number of reasons. (Dkt. No. 73 at 7–11.)

8    The 2002 General Permit requires the SWPPP to include a stormwater sampling plan that

9    identifies points of discharge, includes a discussion of how the permittee determined which

10   points of discharge to monitor, and indicates who will conduct the sampling, where the samples

11   will be taken, and the parameters for analysis. (Dkt. No. 74-2 at 2; Dkt. No. 74-4 at 11.) Plaintiff

12   contends that Defendant's 2001 SWPPP does not include a stormwater sampling plan. (Dkt. No.

13   73 at 8.) Upon reviewing Defendant's 2001 SWPPP, the Court does not see a stormwater

14   sampling plan included. (*See* Dkt. No. 75-1 at 92–102.) Defendant does not respond to this

15   allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2).

16   The Court grants Plaintiff's motion for summary judgment that Defendant's 2001 SWPPP

17   violated the 2002 permits by not including a stormwater sampling plan.

18        The 2002 General Permit and Modified General Permit require that visual monitoring be

19   done at least quarterly. (Dkt. No. 74-1 at 25; Dkt. No. 74-3 at 20.) Plaintiffs allege that

20   Defendant's SWPPP did not meet these requirements, because Defendant's SWPPP only called

21   for one visual inspection during a stormwater discharge each year. (Dkt. No. 73 at 8.) However,

22   Defendant submits the declaration of Marsi Beeson that certifies that Ms. Beeson reviewed

23   Defendant's records and found that Defendant had an inspection report for every quarter but two

24   and, for those two quarters, Defendant submitted discharge monitoring reports. (Dkt. No. 87-2 at

25   5.) While the permits require the SWPPP to include a monitoring plan, the permits do not state

26   that the SWPPP must explicitly state that quarterly visual inspections must occur. (*See* Dkt. No.

74-2 at 39; Dkt. No. 74-4 at 11.) Rather, the permits simply provide that quarterly visual monitoring must occur. (Dkt. No. 74-1 at 25; Dkt. No. 74-3 at 20.) While Defendant's SWPPP does not explicitly state that quarterly visual inspections will occur, Ms. Beeson's declaration indicates that they did indeed occur. (Dkt. No. 87-2 at 5.) Thus, Defendant only violated the permit requirements if the visual inspections did not occur quarterly. This is a factual dispute and the Court declines to exercise summary judgment.

The permits require the SWPPP to include an inventory of industrial activities that identifies the areas associated with industrial activities, including outdoor storage of materials and vehicle and equipment fueling, maintenance and cleaning. (Dkt. No. 74-2 at 1; 74-4 at 46.) Plaintiff alleges that Defendant's 2001 SWPPP violated the permits by only vaguely mentioning certain categories of industrial activities without fully identifying the activities or where they occur, by not having up-to-date information on caboose-fueling activities near the hump track, and by not mentioning direct-to-locomotive fueling. (Dkt. No. 73 at 8–9.) As for the identification of areas where the outdoor storage of materials occurred, Defendant cites the Department of Ecology's deposition testimony that material storage areas were not covered by the 2002 permits. (Dkt. No. 87-1 at 13.) Thus, there is a factual dispute as to whether Defendant's 2001 SWPPP was required to identify storage areas, and the Court declines to exercise summary judgment on that issue.

Defendant maintains that its 2001 SWPPP did not violate the 2002 permits, because Section 3.1 identifies the industrial activities at Balmer Yard to be railcar maintenance, caboose fueling, and material storage, because the 2001 SWPPP identifies the Facility Plan, and because Sections 4.4 and Table 4-2 of the 2001 SWPPP provide further description of the areas. (Dkt. No. 82 at 14.) The Court concludes that there is a factual dispute as to whether these descriptions were sufficient to comply with the permits. Accordingly, the Court declines to grant summary judgment.

Plaintiff alleges that the SWPPP was not up-to-date because it refers to caboose fueling

near the hump track when Defendant discontinued that activity around 1995. (Dkt. No. 73 at 9.) However, Defendant maintains that there is conflicting information about the caboose fueling, and that the above-ground storage tank and piping remained, and the tank was only taken out of service in 2008. (Dkt. No. 87-2 at 6.) Accordingly, a factual dispute remains and the Court declines to grant summary judgment.

Plaintiff alleges that the SWPPP is deficient in not mentioning direct-to-locomotive fueling that has occurred at Balmer Yard since 1990. (Dkt. No. 73 at 9.) Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants summary judgment that Defendant's 2001 SWPPP violated the permits by not mentioning direct-to-locomotive fueling.

The permits required the SWPPP to include an inventory of materials listing the types of materials handled at the site that could potentially result in stormwater pollution and a narrative for each material describing the potential of the pollutant to be present in stormwater discharges. (Dkt. No. 74-2 at 2; Dkt. No. 74-4 at 10.) Plaintiff alleges that Defendant's 2001 SWPPP did not include the necessary materials inventory with the required narrative. (Dkt. No. 73 at 9.) Figure 4.2 of the 2001 SWPPP provides a list of materials potentially exposed to stormwater. (Dkt. No. 75-1 at 91.) However, the Court finds no narrative in the 2001 SWPPP describing the potential of the pollutant to be present in stormwater discharges. Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). Thus, the Court grants summary judgment that Defendant's 2001 SWPPP violated the permits by not providing the required narrative.

The permits also require best management practices (BMPs) that describe the schedule or frequency for all good-housekeeping and preventive-maintenance activities and that indicate specific individuals by name who are part of the pollution prevention team. (Dkt. No. 74-2 at 3; Dkt. No. 74-4 at 12.) Plaintiff alleges that Defendant's 2001 SWPPP did not comply with the permits because it only vaguely stated that "periodic" inspections to identify leaks were

1   conducted and that catch basins were "regularly" inspected and because it did not identify the

2   members of the pollution prevention team. (Dkt. No. 73 at 9.) Defendant responds to these

3   allegations by stating that the permits did not require any more specificity than a statement of the

4   "schedule/frequency" and that the facts show that the inspections occurred quarterly. (Dkt. No.

5   82 at 15.) However, the Court concludes that the terms "regularly" and "periodic" are not

6   sufficiently specific statements of the schedule or frequency of inspections. While the evidence

7   shows that the inspections likely actually occurred quarterly, the 2001 SWPPP should have

8   affirmatively indicated that the inspections occurred quarterly. The Court grants Plaintiff

9   summary judgment on the issue. Additionally, Defendant maintains that its inspection reports

10  were signed by inspectors, so it complied with the permits. However, the 2001 SWPPP does not

11  indicate specific individuals, by name, that were part of the pollution prevention team.

12  Accordingly, the Court grants Plaintiff summary judgment on the issue.

13          The permits also required the use of volume-control BMPs and treatment BMPs in

14  certain circumstances and required SWPPPs to include a narrative describing how the permittee

15  determined if treatment and volume-control BMPs were or were not required. (Dkt. No. 74-2 at

16  4; Dkt. No. 74-4 at 13.) Plaintiff maintains that Defendant's 2001 SWPPP violated the permits

17  because it only stated that it did not use volume-control or treatment BMPs at its facility and did

18  not include the required narrative. (Dkt. No. 73 at 10.) Defendant argues that it was not required

19  to include narratives because its facility was not in a Level Three Response and was not a new

20  development or redevelopment. (Dkt. No. 82 at 15.) Defendant's argument relies on an

21  inaccurate reading of the permits. If Defendant was indeed not required to have treatment or

22  volume-control BMPs for the reasons it states, Defendant was at the minimum required to have a

23  narrative explaining the reasons it was not so required. (Dkt. No. 74-2 at 4; Dkt. No. 74-4 at 13.)

24  Defendant failed to include the required narratives on volume control and treatment BMPs. The

25  Court grants Plaintiff summary judgment.

26          The permits required that an SWPPP be signed by either an executive officer of at least

1   the level of vice president or a "duly authorized representative." (*See* Dkt. No. 74-1 at 37; Dkt.

2   No. 74-2 at 10–11; Dkt. No. 74-4 at 7; Dkt. No. 74-5 at 2–3.) A "duly authorized representative"

3   was a person who had written authorization to Ecology from an officer of at least the vice-

4   president level and who had overall operational or environmental responsibility for the facility.

5   (Dkt. No. 74-2 at 10–11; Dkt. No. 74-5 at 2–3.) Jennifer Wiener (formerly Anderson) signed

6   Defendant's 2001 SWPPP. (Dkt. No. 75-1 at 78.) Plaintiff alleges that Jennifer Wiener's signing

7   of the SWPPP violated the permits because she was neither an executive officer nor a duly

8   authorized representative. (Dkt. No. 73 at 10.) To rebut this argument, Defendant points to a

9   letter dated June 30, 1997, from David M. Smith, Manager of Environmental Remediation to

10  Ecology, informing Ecology that Ms. Wiener was assuming the Manager of Environmental

11  Operations position. (Dkt. No. 4.) However, Mr. Smith was not of at least the level of vice

12  president of the corporation, so Mr. Smith could not make the authorization. In July 2009, Mark

13  A. Schulze, the Vice President of Safety, Training and Operations Support sent a letter to

14  Ecology authorizing Ms. Wiener to sign environmental permits and reports. (Dkt. No. 85 at 9.)

15  Mr. Schulze's letter properly served to make Ms. Wiener a "duly authorized representative."

16  However, until then, Ms. Wiener was not a "duly authorized representative." The Court grants

17  Plaintiff summary judgment that Ms. Wiener's signing of the 2001 SWPPP violated the permits.

18              **2.  Defendant's 2005 SWPPP**

19          Plaintiff alleges that Defendant's 2005 SWPPP similarly violated the Modified 2002

20  General Permit—the effective permit for the entire life of the 2005 SWPPP. (Dkt. No. 73 at 11.)

21  The 2002 modified permit required an SWPPP to include a site map that was drawn to an

22  identified scale or included relative distances between significant structures and drainage

23  systems and that showed the stormwater drainage and discharge features, an outline of the

24  stormwater drainage areas for each discharge point, paved areas and buildings, areas of pollutant

25  contact, and vehicle service areas. (Dkt. No. 74-4 at 9–10.) Plaintiff alleges that the site map in

26  the 2005 SWPPP did not meet any of those requirements. (Dkt. No. 73 at 11.) Defendant

1   responds to this allegation by maintaining that the map showed drainage direction, catch basins,

2   and notes the discharge point. (Dkt. No. 82 at 15.) Thus, a factual question exists as to whether

3   the 2005 SWPPP map adequately demonstrated the stormwater drainage and discharge features

4   and an outline of the stormwater drainage areas for each discharge point. Accordingly, the Court

5   denies summary judgment on those issues. The Court grants summary judgment that Defendant's

6   2005 SWPPP failed to include a site map that was drawn to scale or include relative distances

7   and that showed paved areas and buildings, areas of pollutant contact, and vehicle service areas.

8        The permit required SWPPPs to include an inventory of industrial activities that

9   identified all areas associated with industrial activity, including the outdoor storage of materials,

10  vehicle and equipment fueling and maintenance, and roofs or other surfaces composed of

11  materials that may be mobilized by stormwater, such as galvanized roofs. (Dkt. No. 74-4 at 10.)

12  Plaintiff alleges that Defendant's 2005 SWPPP failed to meet those requirements because the

13  SWPPP only mentioned that direct-to-locomotive fueling and rail-car maintenance occurred, but

14  did not identify where they occurred, because the SWPPP does not discuss the outdoor storage of

15  materials associated with rail-car maintenance or fueling, and because the galvanized roof of the

16  car shop was not identified. (Dkt. No. 73 at 11–12.) As discussed above, a factual dispute exists

17  as to whether the 2002 permits covered material storage at a transportation facility. Accordingly,

18  the Court declines to exercise summary judgment on that issue. However, Defendant does not

19  respond the Plaintiff's allegations that it failed to identify the galvanized roof of the car shop and

20  did not identify where direct-to-locomotive fueling and rail-car maintenance occurred. Defendant

21  has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2).The Court grants

22  summary judgment on those claims.

23       The 2002 Modified Permit required an SWPPP to include an inventory of materials

24  handled at the site with a narrative describing the potential for each pollutant to be present in the

25  stormwater discharges, as well as the method and location of storage. (Dkt. No. 74-4 at 10.)

26  Plaintiff alleges that Defendant's 2005 SWPPP violated the permit by not including the required

1   narratives and by not mentioning certain sources of potentially polluting materials, such as a 500

2   gallon gasoline tank. (Dkt. No. 73 at 12.) Defendant notes that the 2008 amendment to the

3   SWPPP included the 500-gallon gasoline tank and that it was likely not present when the 2005

4   SWPPP was prepared. (Dkt. No. 82 at 15–16.) A factual dispute exists as to whether the gasoline

5   tank was present in 2005, so the Court declines to exercise summary judgment. Defendant does

6   not respond to the contention that its 2005 SWPPP lacked the required narratives for inventory of

7   materials. Defendant fails to show that a genuine issue for trial exists. *See* Fed. R. Civ. P.

8   56(e)(2). The Court grants Plaintiff summary judgment on this issue.

9       The permit required Defendant's 2005 SWPPP to include a monitoring plan that

10  identified all points of discharge to surface waters or storm drain systems and a discussion of

11  how Defendant selected which points to sample, a means to estimate the volume/rate of

12  discharge from each discharge point, differences in exposure to pollutants, pollutants likely to be

13  in each discharge, and a relative comparison of probably pollutant concentrations. (Dkt. No. 74-4

14  at 11.) Plaintiff contends that Defendant's 2005 SWPPP did not include any of the required

15  evaluations and provided contradictions on where samples were collected from and did not

16  provide up-to-date sampling location information. (Dkt. No. 73 at 13.) Defendant disputes the

17  argument that it contradicted itself with regard to the sampling, stating that in times of heavy

18  precipitation, one sampling location was used, while, at other times, a different location was

19  used. (Dkt. No. 82 at 16.) A factual dispute exists, so the Court denies summary judgment on the

20  issue. Defendant does not rebut the other allegations that its SWPPP did not include the required

21  evaluations. The Court grants summary judgment.

22      The Modified 2002 General Permit required Defendant's 2005 SWPPP to include BMPs

23  for cleanup equipment and procedures for direct-to-locomotive fueling activities. (74-4 at 48.)

24  Plaintiff alleges that Defendant's 2005 SWPPP failed to include the required plan. (Dkt. No. 73

25  at 13–15.) Defendant rebuts these allegations, stating that the SWPPP references and "essentially

26  incorporates" the Spill Prevention, Control and Containment Plan, which it claims includes the

required information. (Dkt. No. 82 at 16.) However, the spill plans provided by Defendant did not mention direct-to-locomotive fueling and were not actually included as part of the 2005 SWPPP. (*See* Dkt. Nos. 89-1 & 89-2.) The Court grants Plaintiff summary judgment that Defendant's 2005 SWPPP violated the permit by failing to include BMPs for cleanup equipment and procedures for direct-to-locomotive fueling activities.

Plaintiff also alleges that Defendant's 2005 SWPPP violated the permit by failing to include the following mandatory BMPs, or alternatively, by failing to provide a narrative on why those BMPs were unnecessary: (1) a BMP to inspect for leaks in all incoming vehicles, parts, and equipment; (2) a BMP to conduct vehicle and equipment maintenance and repairs in a building or other covered impervious area; (3) the BMPs required for mobile fueling operations; (4) a BMP requiring large mobile equipment be parked in designated contained areas; and (5) treatment BMPs for the staging and maintenance areas around the Car Shop and other areas that are susceptible to leaks or spills. (Dkt. No. 73 at 13–15.) Defendant does not respond to these allegations and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants summary judgment.

Finally, Plaintiff alleges that the 2005 SWPPP violated the permit because, as with the 2001 SWPPP, only Jennifer Wiener signed the 2005 SWPPP. (Dkt. No. 73 at 15.) As discussed previously, Ms. Wiener was not authorized to sign an SWPPP until 2009. Accordingly, the Court grants summary judgment that Defendant's 2005 SWPPP violated the 2002 Modified Permit.

### 3. Stormwater Sampling

The permits required Defendant to collect and analyze a sample of its stormwater discharges each calendar quarter beginning with the second quarter of 2003. (*See* Dkt. No. 74-1 at 23–16; Dkt. No. 74-3 at 15–17, 20–22.) The 2002 General Permit contained stringent criteria for when samples should be taken, including a minimum of .1 inches of rain in a 24-hour period that is preceded by a 24-hour period of no measurable rain. (Dkt. No. 74-1 at 23–25.) Permittees were not required to sample outside of regular business hours or during unsafe conditions. (*Id.* at

23.) In 2004, Ecology modified the permit requirements to change the storm event criteria requirements to guidelines, allowing a permittee whose sample did not meet all of the criteria to instead include an explanation of what criteria were not met and why. (Dkt. No. 74-3 at 16–17.) The reason for this change was the difficulty that permittees had in collecting stormwater runoff samples that met all of the criteria. (Dkt. No. 75-4 at 78–79.) The modification went into effect in January 2005. Thus, from January 2005 on, the permit required Defendant to collect a stormwater sample each calendar quarter if there was sufficient precipitation anytime during the quarter to collect a sample.

Plaintiff alleges that Defendant violated the sampling requirements of the 2002 Modified Permit by only collecting samples in five of the nineteen quarters between the first quarter of 2005 and the third quarter of 2009. (Dkt. No. 73 at 16.) Plaintiff cites to Defendant's Discharge Monitoring Reports (DMRs) from that time period as support for its allegations. (Dkt. No. 75-2 at 18–41.) Plaintiff also points to a warning letter that Ecology sent to Defendant after Defendant did not take a single sample in 2005. (Dkt. No. 75-4 at 48–49.) Plaintiff's expert on stormwater management compared the amounts of precipitation on the days that Defendant actually collected samples to the amount of precipitation on different days in the quarters in which Defendant failed to collect samples. (Dkt. No. 76 at 10–12.) Plaintiff's expert concluded that there was ample precipitation for sampling purposes in each of the fourteen quarters that Defendant failed to sample its discharge. (*Id.*) Additionally, Plaintiff's expert concluded that the chances of there being no opportunity to sample during daytime, weekday hours in all of those quarters was miniscule. (*Id.*)

Defendant defends itself by saying that it was exempt from collecting samples outside of regular business hours or during unsafe conditions. (Dkt. No. 82 at 9.) However, the permit defines "regular business hours" as the times that the "facility is engaged in its primary production process" and requires facilities that operate 24/7 to be prepared to sample "at all times." (Dkt. No. 89-3 at 5.) Defendant does not contest that its facility operates 24/7.

1    Accordingly, the permit required Defendant to be prepared to sample at all times. Defendant's

2    sweeping contention, without any factual support, that it would be unsafe to conduct sampling at

3    night is unpersuasive. Furthermore, Defendant does not rebut Plaintiff's expert statement that

4    there was ample rainfall during daytime, weekday hours for collection. Defendant further argues

5    that some of the gaps in sampling collection resulted because Defendant was evaluating and

6    changing sampling methods and locations. (Dkt. No. 82 at 10.) If that were true, Defendant

7    should have included such an explanation with their DMRs. (Dkt. No. 75-4 at 79.) However,

8    only three of the DMRs during the time period include such an explanation. (*See* Dkt. No. 75-2

9    at 18–41.) The DMR for the first quarter of 2005 indicates that the sampling point was being

10   relocated because no discharge was observed during qualifying rain events. (Dkt. No. 75-2 at

11   18.) This same explanation could arguably apply to the second, third, and fourth quarters of 2005

12   because the sampling point had not been moved yet. The DMR for the fourth quarter of 2008 and

13   the first quarter of 2009 indicate that sampling did not occur because the stormwater conveyance

14   line was plugged due to recent construction but that construction of a new sampling port was

15   underway. (Dkt. No. 75-2 at 38–39.) Thus, Defendant creates a factual question as to whether or

16   not it complied in the first, second, third, and fourth quarters of 2005, the fourth quarter of 2008,

17   and the first quarter of 2009. The Court denies summary judgment that Defendant violated the

18   sampling requirements for those quarters. The Court grants Plaintiff summary judgment that

19   Defendant violated the permits by not conducting sampling in the second, third, and fourth

20   quarters of 2006, the first and second quarters of 2007, the second and third quarters of 2008, and

21   the second quarter of 2009, because Defendant has not demonstrated that a genuine factual

22   dispute exists.

23        Plaintiff also alleges that Defendant violated the permits by having Ms. Wiener sign its

24   DMRs. (Dkt. No. 73 at 17.) As discussed above, Ms. Wiener was not authorized with signatory

25   authority until July 2009. Therefore, Defendant violated the permits by having only Ms. Wiener

26   sign its DMRs from the second quarter of 2003 through the first quarter of 2009. The Court

1    grants Plaintiff summary judgment.

2                    **4.   Visual Monitoring Requirement**

3            The 2002 Modified General Permit required Defendant to conduct several types of visual

4    monitoring. The permit required visual monitoring of stormwater discharges each quarter at the

5    location of stormwater sampling, and all discharge locations that were not sampled were to be

6    visually inspected at least annually during a storm event. (Dkt. No. 74-3 at 27.) Those

7    inspections were to monitor for various discharge characteristics and to determine whether the

8    SWPPP was accurate, current, properly implemented, and adequate. (*Id.*) The permit also

9    required a dry season inspection each year to determine if any non-stormwater discharges were

10   present in the stormwater system. (*Id.*) The permit required the results of all visual monitoring to

11   be recorded in a report signed by the person making the observations and then reviewed by a

12   "duly authorized representative," including a certification by that person that the facility was in

13   compliance with the SWPPP and the permit.  (*Id.* at 27–28.) Additionally, the permit required

14   Defendant to retain those records for a minimum of five years and throughout the course of any

15   litigation. (*Id.* at 29.)

16           Plaintiff alleges that Defendant violated the permit by failing to visually monitor its

17   discharges and/or by failing to document such monitoring in the fourth quarter of 2005 and the

18   third quarter of 2006. (Dkt. No. 73 at 18.) Defendant testified that Exhibit 56 from the deposition

19   included all of its visual monitoring records. (Dkt. No. 75-6 at 140–41.) Yet a visual monitoring

20   report is missing for the fourth quarter of 2005 and the only monitoring report for the third

21   quarter of 2006 does not include any indication that visual monitoring occurred. (*See* Dkt. No.

22   75-3 at 2–47.) Defendant does not respond to these allegations and has not shown that a genuine

23   issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). Accordingly, the Court grants Plaintiff

24   summary judgment that Defendant violated the permit by failing to conduct and/or document

25   visual monitoring during the fourth quarter of 2005 and the third quarter of 2006.

26           Plaintiff also contends that Defendant violated the permit by failing to monitor each of its

discharge locations at least once annually during a precipitation event in 2005, 2006, 2007, 2008, and 2009. (Dkt. No. 73 at 18.) Plaintiff supports its allegation with Defendant's deposition testimony that indicates that Defendant has no documentation of the monitoring of every catch basin in its facility in 2005 through 2009, as well as Defendant's visual monitoring records, which do not include any evidence of inspections of each catch basin occurring. (Dkt. No. 75-6 at 132, 134–35, 137, 139–40; Dkt. No. 75-3 at 2–47.) It is apparent that Plaintiff is interpreting the permit's requirement to monitor every "discharge location" to mean that Defendant was required to monitor every catch basin. However, Defendant contests that definition and the permit does not further define the phrase. A dispute of fact exists, so the Court declines to grant summary judgment.

Plaintiff further alleges that Defendant violated the permit by not conducting the required dry season inspection in 2008 and 2009. (Dkt. No. 18.) As evidence, Plaintiff points to Defendant's deposition testimony that it has no documentation indicating that the dry season inspections occurred in 2008 or 2009. (Dkt. No. 75-6 at 136, 138.) Defendant contests this allegation, saying that dry season inspections were conducted, but Defendant does not cite any evidence or documentation to support its position. (Dkt. No. 82 at 12.) Defendant failed to meet its burden of showing that a genuine factual dispute exists. The Court grants summary judgment.

Plaintiff alleges that Defendant violated the permit because Defendant's visual monitoring records are signed only by outside consultants and not by a person as specified by the permit. (Dkt. No. 73 at 18.) Defendant does not rebut this allegation. The Court grants summary judgment.

### 5.  Adaptive Management Requirements

The permit required differing levels of response—Level One, Two, or Three—if quarterly sampling results were above a benchmark value or parameter. (*See* Dkt. No. 74-3 at 17–30.) At a Level One Response, the permit required an inspection of the facility to: (1) evaluate possible sources of the benchmark parameter; (2) evaluate source control and

1  operational control methods to reduce stormwater contamination; and (3) evaluate whether any

2  improvements or changes of the SWPPP were warranted. (*Id.* at 25.) The permit required that the

3  results of the inspection, including any remedial actions taken, be summarized and placed in the

4  SWPPP. (*Id.*)

5         A Level Two Response required the permittee to: (1) promptly identify the potential

6  sources of contamination; (2) investigate all available options of source control, operational

7  control, and stormwater treatment BMPs to reduce contamination levels to below benchmark

8  values; (3) implement additional source control and operational BMPs identified; (4) prepare a

9  level two source control report outlining actions taken, planned and any scheduled; and (5)

10  submit the report to Ecology within six months. (*Id.* at 19.)

11         A Level Three Response required the permittee to: (1) promptly identify the potential

12  sources of contamination; (2) investigate all available options of source control, operational

13  control, and stormwater treatment BMPs to reduce stormwater contaminate levels to or below the

14  benchmark values; (3) implement additional source control, operational control, and stormwater

15  treatment BMPs identified as part of the investigation within twelve months of initiating the

16  response; (4) prepare a level three source control report outlining actions taken, planned, and

17  scheduled, and (5) submit the report to Ecology within twelve months. (*Id.*) The permittee could

18  request a waiver from employing stormwater treatment BMPs, but the waiver had to be

19  submitted to Ecology within three months of initiating the response and had to include an

20  explanation of why the BMPs were infeasible and not necessary for compliance. (*Id.* at 19–20.)

21                       **a.  First Quarter of 2006**

22         Plaintiff alleges that Defendant triggered the Level One Response for the first quarter of

23  2006, but that Defendant violated the permit by not fulfilling the Level One Response

24  requirements. (Dkt. No. 73 at 20.) Plaintiff alleges that Defendant violated the permit because it

25  did not include a summary in its SWPPP of the additional BMPs it implemented as a result of the

26  Level One Response. (Dkt. No. 73 at 20.) Defendant does not respond to this allegation and has

1    not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants

2    summary judgment.

3    　　　Plaintiff further alleges that Defendant violated the permit because the letter to Ecology

4    describing its Level One Response actions was not signed in accordance with the permit

5    requirements. (Dkt. No. 73 at 20.) The permit requires that all information sent to Ecology be

6    signed and certified by the appropriate authority. (*See* Dkt. No. 74-5 at 2–3.) The letter to

7    Ecology is signed by an outside consultant who was not a "duly authorized representative." (*See*

8    Dkt. No. 75-5 at 2.) However, the letter is not purported to be from Defendant, and the Level

9    One Response makes no indication that Defendant was required to send a letter to or notify

10   Ecology at all beyond including results in its SWPPP. Accordingly, the Court denies Plaintiff

11   summary judgment.

12   　　　　　　　　　　**b.  Third Quarter of 2007**

13   　　　Plaintiff alleges that Defendant triggered a Level Two Response in the third quarter of

14   2007, but that Defendant did not comply with the permit requirements. (Dkt. No. 73 at 21.)

15   Plaintiff alleges that Defendant violated the permit by not including in its SWPPP the additional

16   BMPs, such as increased inspection frequency and increased sweeping, it stated in its letter that

17   it was going to implement as a result of the Level Two Response. (Dkt. No. 73 at 21.) Defendant

18   does not respond to this allegation and has not shown that a genuine issue for trial exists. *See*

19   Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff summary judgment.

20   　　　Further, Defendant testified that "available information" indicates that it did not actually

21   implement the sweeping BMP, as it stated it would do in its letter to Ecology. (Dkt. No. 75-6 at

22   156.) Plaintiff alleges that Defendant thus violated the permit by not implementing its Level Two

23   Response. (Dkt. No. 73 at 21.) However, Defendant maintains that it directed its maintenance

24   shop personnel to increase sweeping frequency and cites to its deposition testimony indicating

25   that such a request was made. (Dkt. No. 75-6 at 156.) A factual dispute exists. The Court denies

26   summary judgment.

1    Plaintiff alleges that Defendant further violated the permit by failing to investigate

2    stormwater treatment BMPs as part of its Level Two Response. (Dkt. No. 73 at 21.) Defendant's

3    testimony indicated that it did not investigate that possibility. (Dkt. No. 75-6 at 155.) The permit

4    specifically requires such an investigation in Level Two Responses. (Dkt. No. 74-3 at 19.)

5    Defendant does not respond to this allegation and has not shown that a genuine issue for trial

6    exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff summary judgment.

7    Plaintiff further alleges that Defendant violated the permit, because the letter sent to

8    Ecology regarding the Level Two Response was not signed in accordance with permit

9    requirements. (Dkt. No. 78 at 21.)  However, as before, the letter is not purported to be sent by

10   Defendant and the permit does not require Defendant to send a letter to Ecology. Instead,

11   Defendant was required to send a source control report to Ecology within six months of initiating

12   the Level Two Response. Plaintiff does not allege that the source control report was improperly

13   signed. The Court denies summary judgment.

### c.   Fourth Quarter of 2007

15   Plaintiff alleges that, in the fourth quarter of 2007, Defendant triggered a Level Two

16   Response for copper and lead and a Level One Response for turbidity and zinc, but that

17   Defendant failed to comply with these requirements. (Dkt. No. 73 at 22.) Plaintiff alleges that

18   Defendant's letter to Ecology that it claims described its fulfillment of the response requirements

19   was deficient in meeting the Level Two Response requirements for copper and lead. (*Id.*)

20   Plaintiff asserts that the letter only acknowledges that the facility is at a Level Two Response for

21   copper and lead, but that Defendant made no effort to identify the sources of copper and lead

22   contamination as required by the permit. (*Id.*) The letter mentions that an elevated metals

23   concentration might be the result of the removal of a filter and increased sweeping. (*See* Dkt. No.

24   75-5 at 7–8.) Defendant maintains that those statements applied to the copper and lead levels,

25   and, thus, the letter identified the sources of contamination. (Dkt. No. 75-6 at 159–61.) A factual

26   dispute exists, and the Court declines to exercise summary judgment.

1    Plaintiff also asserts that Defendant failed to investigate stormwater treatment BMPs as

2    the permit required for a Level Two Response. (*Id.*) Plaintiff points to Defendant's deposition

3    testimony, where Marsi Beeson states that, based on the available documents, Defendant did not

4    investigate the possibility of stormwater treatment BMPs. (Dkt. No. 75-6 at 163.) Defendant

5    does not respond to this allegation and has not shown that a genuine issue for trial exists. *See*

6    Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff summary judgment.

7    Plaintiff asserts that Defendant actually removed a BMP rather than implementing

8    additional BMPs during its Level Two Response. (Dkt. No. 73 at 22.) The BMP removed was a

9    catch basin filter. (*Id.*) Defendant maintains that it removed the filter because, when the filter was

10   regularly removed for sampling, it disturbed the collected sediment and biased the sample

11   results. (Dkt. No. 82 at 18.) Defendant states that it removed the one filter in an effort to secure

12   more accurate sample results. (*Id.*) A factual dispute exists as to whether this violated the permit.

13   The Court declines to exercise summary judgment.

14   Plaintiff also alleges that Defendant violated the permit by having Marsi Beeson sign the

15   letter to Ecology. (Dkt. No. 73 at 22.) Ms. Beeson was not a duly authorized representative of

16   Defendant. (Dkt. No. 75-6 at 158.) Accordingly, the Court grants summary judgment that

17   Defendant violated the permit by having only Ms. Beeson sign the letter to Ecology.

18                              **d.  First Quarter of 2008**

19   Plaintiff alleges that, in the first quarter of 2008, Defendant triggered a Level Three

20   Response for turbidity and zinc and a Level One Response for copper and lead, but that

21   Defendant made no effort to comply with the permit requirements for those responses. (Dkt. No.

22   73 at 23.) A Level Three Response explicitly requires implementation of additional BMPs. (Dkt.

23   No. 74-3 at 19.) Stormwater treatment BMPs were required unless the permittee requested and

24   Ecology granted a waiver. (*Id.*) Plaintiff alleges that Defendant failed to conduct any evaluation

25   or implementation whatsoever of additional operational, source control, and treatment BMPs as

26   part of its Level Three Response to reduce contamination of discharge. (*Id.*) Plaintiff points to

1   Defendant's letter to Ecology that makes no mention of the investigation or implementation of

2   additional BMPs. (Dkt. No. 75-5 at 10–11.) Additionally, Defendant's deposition testimony

3   indicates that it did not investigate additional BMPs after the Level Three Response. (Dkt. No.

4   75-6 at 169–70.) Additionally, Defendant did not request a waiver from employing stormwater

5   treatment BMPs. (Dkt. No. 75-6 at 172.) Defendant does not respond to these allegations and has

6   not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2).The Court grants

7   summary judgment.

8           Plaintiff alleges that Defendant violated the permit because only Marsi Beeson signed its

9   letter to Ecology. (Dkt. No. 75-5 at 10.) Ms. Beeson was not a duly authorized representative of

10  Defendant. (Dkt. No. 75-6 at 158.) Accordingly, the Court grants summary judgment that

11  Defendant violated the permit by having only Ms. Beeson sign the letter to Ecology.

12  **III.**    **CONCLUSION**

13          For the foregoing reasons, the Court GRANTS Plaintiff's first motion for partial

14  summary judgment (Dkt. No. 72) and GRANTS IN PART and DENIES IN PART Plaintiff's

15  second motion for partial summary judgment (Dkt. No. 73.)

16          DATED this 19th day of August 2011.

17

18

19  _____
    John C. Coughenour
20  UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

ORDER, C09-1087-JCC
PAGE - 19