THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PUGET SOUNDKEEPER ALLIANCE, a non-profit corporation

Plaintiff,

v.

BNSF RAILWAY COMPANY,

Defendant.

CASE NO. C09-1087-JCC

ORDER

This matter comes before the Court on Plaintiff's motions[1] for summary judgment (Dkt. Nos. 72, 73), Defendant's response (Dkt. No. 82), and Plaintiff's reply (Dkt. No. 88.). Having thoroughly considered the parties' briefing and the relevant record, the Court grants the first motion and grants in part and denies in part the second motion for the reasons explained herein.

**I.     BACKGROUND**

Defendant owns and operates a railroad-transportation facility in the Interbay neighborhood

---

[1] Local Rule 7(e)(3) states: "Motions for summary judgment . . . shall not exceed twenty-four pages. . . . The filing of multiple dispositive motions to avoid the page limits of this rule is strongly discouraged and successive motions may be stricken." Plaintiff filed two successive motions for summary judgment, each containing twenty-five substantive pages and totaling fifty substantive pages. (Dkt. Nos. 72, 73.) However, Plaintiff did not file a motion requesting permission to file an over-length motion. The Court is inclined to strike both motions. However, due to the impending trial date, the Court will not do so. However, Plaintiff is warned against such flagrant disregard of the local rules in the future.

of Seattle, Washington. (Dkt. No. 44 at 4.) Plaintiff, an environmental nonprofit organization dedicated to tracking down and stopping the discharge of toxic pollutants into the Puget Sound, alleges that Defendant violated the Clean Water Act (CWA) by discharging pollutants into the navigable surface waters of the state. (*Id.* at 3, 8.) The Court discusses Plaintiffs' claims and allegations, as well as the underlying statutory structure, in detail in its previous order. (*See* Dkt. No. 43.)

## II. DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of the law." Fed. R. Civ. P. 56(a). A defendant is entitled to move for summary judgment by alleging that the nonmoving party has failed to make a sufficient showing on an essential element of his or her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). To overcome such a motion, the plaintiff bears the burden of producing evidence with respect to the identified element; the plaintiff's response must set out specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2). "One of the principal purposes of the summary-judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323.

### A. Unpermitted Discharges

Plaintiff requests that the Court grant summary judgment finding that Defendant violated section 301(a) of the CWA, 33 U.S.C. § 1311(a) by discharging stormwater associated with industrial activity since November 3, 2009, and that these violations occurred on seventy-eight specific dates. (*See* Dkt. No. 72.) Defendant admits these violations and concedes that the Court should grant Plaintiff's motion. (Dkt. No. 82 at 6.) Accordingly, the Court grants Plaintiff summary judgment that Defendant violated section 301(a) of the CWA by discharging stormwater associated with industrial activities from its Balmer Yard on the seventy-eight days specified in Plaintiff's motion. However, the Court does not at this time determine the amount of penalty to be imposed for those violations.

**B.     NPDES Permit Violations**

Plaintiff also moves for summary judgment finding that Defendant violated sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342, by violating the terms of its National Pollutant Discharge Elimination System (NPDES) permit. (*See* Dkt. No. 73.)

**1. 2001 Stormwater Pollution Prevention Plan**

Plaintiff alleges that Defendant's 2001 Stormwater Pollution Prevention Plan (SWPPP) failed to comply with the 2002 General Permit for a number of reasons. (Dkt. No. 73 at 7–11.) The 2002 General Permit requires the SWPPP to include a stormwater sampling plan that identifies points of discharge, includes a discussion of how the permittee determined which points of discharge to monitor, and indicates who will conduct the sampling, where the samples will be taken, and the parameters for analysis. (Dkt. No. 74-2 at 2; Dkt. No. 74-4 at 11.) Plaintiff contends that Defendant's 2001 SWPPP does not include a stormwater sampling plan. (Dkt. No. 73 at 8.) Upon reviewing Defendant's 2001 SWPPP, the Court does not see a stormwater sampling plan included. (*See* Dkt. No. 75-1 at 92–102.) Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff's motion for summary judgment that Defendant's 2001 SWPPP violated the 2002 permits by not including a stormwater sampling plan.

The 2002 General Permit and Modified General Permit require that visual monitoring be done at least quarterly. (Dkt. No. 74-1 at 25; Dkt. No. 74-3 at 20.) Plaintiffs allege that Defendant's SWPPP did not meet these requirements, because Defendant's SWPPP only called for one visual inspection during a stormwater discharge each year. (Dkt. No. 73 at 8.) However, Defendant submits the declaration of Marsi Beeson that certifies that Ms. Beeson reviewed Defendant's records and found that Defendant had an inspection report for every quarter but two and, for those two quarters, Defendant submitted discharge monitoring reports. (Dkt. No. 87-2 at 5.) While the permits require the SWPPP to include a monitoring plan, the permits do not state that the SWPPP must explicitly state that quarterly visual inspections must occur. (*See* Dkt. No.

74-2 at 39; Dkt. No. 74-4 at 11.) Rather, the permits simply provide that quarterly visual monitoring must occur. (Dkt. No. 74-1 at 25; Dkt. No. 74-3 at 20.) While Defendant's SWPPP does not explicitly state that quarterly visual inspections will occur, Ms. Beeson's declaration indicates that they did indeed occur. (Dkt. No. 87-2 at 5.) Thus, Defendant only violated the permit requirements if the visual inspections did not occur quarterly. This is a factual dispute and the Court declines to exercise summary judgment.

The permits require the SWPPP to include an inventory of industrial activities that identifies the areas associated with industrial activities, including outdoor storage of materials and vehicle and equipment fueling, maintenance and cleaning. (Dkt. No. 74-2 at 1; 74-4 at 46.) Plaintiff alleges that Defendant's 2001 SWPPP violated the permits by only vaguely mentioning certain categories of industrial activities without fully identifying the activities or where they occur, by not having up-to-date information on caboose-fueling activities near the hump track, and by not mentioning direct-to-locomotive fueling. (Dkt. No. 73 at 8–9.) As for the identification of areas where the outdoor storage of materials occurred, Defendant cites the Department of Ecology's deposition testimony that material storage areas were not covered by the 2002 permits. (Dkt. No. 87-1 at 13.) Thus, there is a factual dispute as to whether Defendant's 2001 SWPPP was required to identify storage areas, and the Court declines to exercise summary judgment on that issue.

Defendant maintains that its 2001 SWPPP did not violate the 2002 permits, because Section 3.1 identifies the industrial activities at Balmer Yard to be railcar maintenance, caboose fueling, and material storage, because the 2001 SWPPP identifies the Facility Plan, and because Sections 4.4 and Table 4-2 of the 2001 SWPPP provide further description of the areas. (Dkt. No. 82 at 14.) The Court concludes that there is a factual dispute as to whether these descriptions were sufficient to comply with the permits. Accordingly, the Court declines to grant summary judgment.

Plaintiff alleges that the SWPPP was not up-to-date because it refers to caboose fueling

near the hump track when Defendant discontinued that activity around 1995. (Dkt. No. 73 at 9.) However, Defendant maintains that there is conflicting information about the caboose fueling, and that the above-ground storage tank and piping remained, and the tank was only taken out of service in 2008. (Dkt. No. 87-2 at 6.) Accordingly, a factual dispute remains and the Court declines to grant summary judgment.

Plaintiff alleges that the SWPPP is deficient in not mentioning direct-to-locomotive fueling that has occurred at Balmer Yard since 1990. (Dkt. No. 73 at 9.) Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants summary judgment that Defendant's 2001 SWPPP violated the permits by not mentioning direct-to-locomotive fueling.

The permits required the SWPPP to include an inventory of materials listing the types of materials handled at the site that could potentially result in stormwater pollution and a narrative for each material describing the potential of the pollutant to be present in stormwater discharges. (Dkt. No. 74-2 at 2; Dkt. No. 74-4 at 10.) Plaintiff alleges that Defendant's 2001 SWPPP did not include the necessary materials inventory with the required narrative. (Dkt. No. 73 at 9.) Figure 4.2 of the 2001 SWPPP provides a list of materials potentially exposed to stormwater. (Dkt. No. 75-1 at 91.) However, the Court finds no narrative in the 2001 SWPPP describing the potential of the pollutant to be present in stormwater discharges. Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). Thus, the Court grants summary judgment that Defendant's 2001 SWPPP violated the permits by not providing the required narrative.

The permits also require best management practices (BMPs) that describe the schedule or frequency for all good-housekeeping and preventive-maintenance activities and that indicate specific individuals by name who are part of the pollution prevention team. (Dkt. No. 74-2 at 3; Dkt. No. 74-4 at 12.) Plaintiff alleges that Defendant's 2001 SWPPP did not comply with the permits because it only vaguely stated that "periodic" inspections to identify leaks were

conducted and that catch basins were "regularly" inspected and because it did not identify the members of the pollution prevention team. (Dkt. No. 73 at 9.) Defendant responds to these allegations by stating that the permits did not require any more specificity than a statement of the "schedule/frequency" and that the facts show that the inspections occurred quarterly. (Dkt. No. 82 at 15.) However, the Court concludes that the terms "regularly" and "periodic" are not sufficiently specific statements of the schedule or frequency of inspections. While the evidence shows that the inspections likely actually occurred quarterly, the 2001 SWPPP should have affirmatively indicated that the inspections occurred quarterly. The Court grants Plaintiff summary judgment on the issue. Additionally, Defendant maintains that its inspection reports were signed by inspectors, so it complied with the permits. However, the 2001 SWPPP does not indicate specific individuals, by name, that were part of the pollution prevention team. Accordingly, the Court grants Plaintiff summary judgment on the issue.

The permits also required the use of volume-control BMPs and treatment BMPs in certain circumstances and required SWPPPs to include a narrative describing how the permittee determined if treatment and volume-control BMPs were or were not required. (Dkt. No. 74-2 at 4; Dkt. No. 74-4 at 13.) Plaintiff maintains that Defendant's 2001 SWPPP violated the permits because it only stated that it did not use volume-control or treatment BMPs at its facility and did not include the required narrative. (Dkt. No. 73 at 10.) Defendant argues that it was not required to include narratives because its facility was not in a Level Three Response and was not a new development or redevelopment. (Dkt. No. 82 at 15.) Defendant's argument relies on an inaccurate reading of the permits. If Defendant was indeed not required to have treatment or volume-control BMPs for the reasons it states, Defendant was at the minimum required to have a narrative explaining the reasons it was not so required. (Dkt. No. 74-2 at 4; Dkt. No. 74-4 at 13.) Defendant failed to include the required narratives on volume control and treatment BMPs. The Court grants Plaintiff summary judgment.

The permits required that an SWPPP be signed by either an executive officer of at least

the level of vice president or a "duly authorized representative." (*See* Dkt. No. 74-1 at 37; Dkt. No. 74-2 at 10–11; Dkt. No. 74-4 at 7; Dkt. No. 74-5 at 2–3.) A "duly authorized representative" was a person who had written authorization to Ecology from an officer of at least the vice-president level and who had overall operational or environmental responsibility for the facility. (Dkt. No. 74-2 at 10–11; Dkt. No. 74-5 at 2–3.) Jennifer Wiener (formerly Anderson) signed Defendant's 2001 SWPPP. (Dkt. No. 75-1 at 78.) Plaintiff alleges that Jennifer Wiener's signing of the SWPPP violated the permits because she was neither an executive officer nor a duly authorized representative. (Dkt. No. 73 at 10.) To rebut this argument, Defendant points to a letter dated June 30, 1997, from David M. Smith, Manager of Environmental Remediation to Ecology, informing Ecology that Ms. Wiener was assuming the Manager of Environmental Operations position. (Dkt. No. 4.) However, Mr. Smith was not of at least the level of vice president of the corporation, so Mr. Smith could not make the authorization. In July 2009, Mark A. Schulze, the Vice President of Safety, Training and Operations Support sent a letter to Ecology authorizing Ms. Wiener to sign environmental permits and reports. (Dkt. No. 85 at 9.) Mr. Schulze's letter properly served to make Ms. Wiener a "duly authorized representative." However, until then, Ms. Wiener was not a "duly authorized representative." The Court grants Plaintiff summary judgment that Ms. Wiener's signing of the 2001 SWPPP violated the permits.

### 2. Defendant's 2005 SWPPP

Plaintiff alleges that Defendant's 2005 SWPPP similarly violated the Modified 2002 General Permit—the effective permit for the entire life of the 2005 SWPPP. (Dkt. No. 73 at 11.) The 2002 modified permit required an SWPPP to include a site map that was drawn to an identified scale or included relative distances between significant structures and drainage systems and that showed the stormwater drainage and discharge features, an outline of the stormwater drainage areas for each discharge point, paved areas and buildings, areas of pollutant contact, and vehicle service areas. (Dkt. No. 74-4 at 9–10.) Plaintiff alleges that the site map in the 2005 SWPPP did not meet any of those requirements. (Dkt. No. 73 at 11.) Defendant

responds to this allegation by maintaining that the map showed drainage direction, catch basins, and notes the discharge point. (Dkt. No. 82 at 15.) Thus, a factual question exists as to whether the 2005 SWPPP map adequately demonstrated the stormwater drainage and discharge features and an outline of the stormwater drainage areas for each discharge point. Accordingly, the Court denies summary judgment on those issues. The Court grants summary judgment that Defendant's 2005 SWPPP failed to include a site map that was drawn to scale or include relative distances and that showed paved areas and buildings, areas of pollutant contact, and vehicle service areas.

The permit required SWPPPs to include an inventory of industrial activities that identified all areas associated with industrial activity, including the outdoor storage of materials, vehicle and equipment fueling and maintenance, and roofs or other surfaces composed of materials that may be mobilized by stormwater, such as galvanized roofs. (Dkt. No. 74-4 at 10.) Plaintiff alleges that Defendant's 2005 SWPPP failed to meet those requirements because the SWPPP only mentioned that direct-to-locomotive fueling and rail-car maintenance occurred, but did not identify where they occurred, because the SWPPP does not discuss the outdoor storage of materials associated with rail-car maintenance or fueling, and because the galvanized roof of the car shop was not identified. (Dkt. No. 73 at 11–12.) As discussed above, a factual dispute exists as to whether the 2002 permits covered material storage at a transportation facility. Accordingly, the Court declines to exercise summary judgment on that issue. However, Defendant does not respond the Plaintiff's allegations that it failed to identify the galvanized roof of the car shop and did not identify where direct-to-locomotive fueling and rail-car maintenance occurred. Defendant has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants summary judgment on those claims.

The 2002 Modified Permit required an SWPPP to include an inventory of materials handled at the site with a narrative describing the potential for each pollutant to be present in the stormwater discharges, as well as the method and location of storage. (Dkt. No. 74-4 at 10.) Plaintiff alleges that Defendant's 2005 SWPPP violated the permit by not including the required

narratives and by not mentioning certain sources of potentially polluting materials, such as a 500 gallon gasoline tank. (Dkt. No. 73 at 12.) Defendant notes that the 2008 amendment to the SWPPP included the 500-gallon gasoline tank and that it was likely not present when the 2005 SWPPP was prepared. (Dkt. No. 82 at 15–16.) A factual dispute exists as to whether the gasoline tank was present in 2005, so the Court declines to exercise summary judgment. Defendant does not respond to the contention that its 2005 SWPPP lacked the required narratives for inventory of materials. Defendant fails to show that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff summary judgment on this issue.

The permit required Defendant's 2005 SWPPP to include a monitoring plan that identified all points of discharge to surface waters or storm drain systems and a discussion of how Defendant selected which points to sample, a means to estimate the volume/rate of discharge from each discharge point, differences in exposure to pollutants, pollutants likely to be in each discharge, and a relative comparison of probably pollutant concentrations. (Dkt. No. 74-4 at 11.) Plaintiff contends that Defendant's 2005 SWPPP did not include any of the required evaluations and provided contradictions on where samples were collected from and did not provide up-to-date sampling location information. (Dkt. No. 73 at 13.) Defendant disputes the argument that it contradicted itself with regard to the sampling, stating that in times of heavy precipitation, one sampling location was used, while, at other times, a different location was used. (Dkt. No. 82 at 16.) A factual dispute exists, so the Court denies summary judgment on the issue. Defendant does not rebut the other allegations that its SWPPP did not include the required evaluations. The Court grants summary judgment.

The Modified 2002 General Permit required Defendant's 2005 SWPPP to include BMPs for cleanup equipment and procedures for direct-to-locomotive fueling activities. (74-4 at 48.) Plaintiff alleges that Defendant's 2005 SWPPP failed to include the required plan. (Dkt. No. 73 at 13–15.) Defendant rebuts these allegations, stating that the SWPPP references and "essentially incorporates" the Spill Prevention, Control and Containment Plan, which it claims includes the

required information. (Dkt. No. 82 at 16.) However, the spill plans provided by Defendant did not mention direct-to-locomotive fueling and were not actually included as part of the 2005 SWPPP. (*See* Dkt. Nos. 89-1 & 89-2.) The Court grants Plaintiff summary judgment that Defendant's 2005 SWPPP violated the permit by failing to include BMPs for cleanup equipment and procedures for direct-to-locomotive fueling activities.

Plaintiff also alleges that Defendant's 2005 SWPPP violated the permit by failing to include the following mandatory BMPs, or alternatively, by failing to provide a narrative on why those BMPs were unnecessary: (1) a BMP to inspect for leaks in all incoming vehicles, parts, and equipment; (2) a BMP to conduct vehicle and equipment maintenance and repairs in a building or other covered impervious area; (3) the BMPs required for mobile fueling operations; (4) a BMP requiring large mobile equipment be parked in designated contained areas; and (5) treatment BMPs for the staging and maintenance areas around the Car Shop and other areas that are susceptible to leaks or spills. (Dkt. No. 73 at 13–15.) Defendant does not respond to these allegations and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants summary judgment.

Finally, Plaintiff alleges that the 2005 SWPPP violated the permit because, as with the 2001 SWPPP, only Jennifer Wiener signed the 2005 SWPPP. (Dkt. No. 73 at 15.) As discussed previously, Ms. Wiener was not authorized to sign an SWPPP until 2009. Accordingly, the Court grants summary judgment that Defendant's 2005 SWPPP violated the 2002 Modified Permit.

### 3. Stormwater Sampling

The permits required Defendant to collect and analyze a sample of its stormwater discharges each calendar quarter beginning with the second quarter of 2003. (*See* Dkt. No. 74-1 at 23–16; Dkt. No. 74-3 at 15–17, 20–22.) The 2002 General Permit contained stringent criteria for when samples should be taken, including a minimum of .1 inches of rain in a 24-hour period that is preceded by a 24-hour period of no measurable rain. (Dkt. No. 74-1 at 23–25.) Permittees were not required to sample outside of regular business hours or during unsafe conditions. (*Id.* at

23.) In 2004, Ecology modified the permit requirements to change the storm event criteria requirements to guidelines, allowing a permittee whose sample did not meet all of the criteria to instead include an explanation of what criteria were not met and why. (Dkt. No. 74-3 at 16–17.) The reason for this change was the difficulty that permittees had in collecting stormwater runoff samples that met all of the criteria. (Dkt. No. 75-4 at 78–79.) The modification went into effect in January 2005. Thus, from January 2005 on, the permit required Defendant to collect a stormwater sample each calendar quarter if there was sufficient precipitation anytime during the quarter to collect a sample.

Plaintiff alleges that Defendant violated the sampling requirements of the 2002 Modified Permit by only collecting samples in five of the nineteen quarters between the first quarter of 2005 and the third quarter of 2009. (Dkt. No. 73 at 16.) Plaintiff cites to Defendant's Discharge Monitoring Reports (DMRs) from that time period as support for its allegations. (Dkt. No. 75-2 at 18–41.) Plaintiff also points to a warning letter that Ecology sent to Defendant after Defendant did not take a single sample in 2005. (Dkt. No. 75-4 at 48–49.) Plaintiff's expert on stormwater management compared the amounts of precipitation on the days that Defendant actually collected samples to the amount of precipitation on different days in the quarters in which Defendant failed to collect samples. (Dkt. No. 76 at 10–12.) Plaintiff's expert concluded that there was ample precipitation for sampling purposes in each of the fourteen quarters that Defendant failed to sample its discharge. (*Id.*) Additionally, Plaintiff's expert concluded that the chances of there being no opportunity to sample during daytime, weekday hours in all of those quarters was miniscule. (*Id.*)

Defendant defends itself by saying that it was exempt from collecting samples outside of regular business hours or during unsafe conditions. (Dkt. No. 82 at 9.) However, the permit defines "regular business hours" as the times that the "facility is engaged in its primary production process" and requires facilities that operate 24/7 to be prepared to sample "at all times." (Dkt. No. 89-3 at 5.) Defendant does not contest that its facility operates 24/7.

Accordingly, the permit required Defendant to be prepared to sample at all times. Defendant's sweeping contention, without any factual support, that it would be unsafe to conduct sampling at night is unpersuasive. Furthermore, Defendant does not rebut Plaintiff's expert statement that there was ample rainfall during daytime, weekday hours for collection. Defendant further argues that some of the gaps in sampling collection resulted because Defendant was evaluating and changing sampling methods and locations. (Dkt. No. 82 at 10.) If that were true, Defendant should have included such an explanation with their DMRs. (Dkt. No. 75-4 at 79.) However, only three of the DMRs during the time period include such an explanation. (*See* Dkt. No. 75-2 at 18–41.) The DMR for the first quarter of 2005 indicates that the sampling point was being relocated because no discharge was observed during qualifying rain events. (Dkt. No. 75-2 at 18.) This same explanation could arguably apply to the second, third, and fourth quarters of 2005 because the sampling point had not been moved yet. The DMR for the fourth quarter of 2008 and the first quarter of 2009 indicate that sampling did not occur because the stormwater conveyance line was plugged due to recent construction but that construction of a new sampling port was underway. (Dkt. No. 75-2 at 38–39.) Thus, Defendant creates a factual question as to whether or not it complied in the first, second, third, and fourth quarters of 2005, the fourth quarter of 2008, and the first quarter of 2009. The Court denies summary judgment that Defendant violated the sampling requirements for those quarters. The Court grants Plaintiff summary judgment that Defendant violated the permits by not conducting sampling in the second, third, and fourth quarters of 2006, the first and second quarters of 2007, the second and third quarters of 2008, and the second quarter of 2009, because Defendant has not demonstrated that a genuine factual dispute exists.

Plaintiff also alleges that Defendant violated the permits by having Ms. Wiener sign its DMRs. (Dkt. No. 73 at 17.) As discussed above, Ms. Wiener was not authorized with signatory authority until July 2009. Therefore, Defendant violated the permits by having only Ms. Wiener sign its DMRs from the second quarter of 2003 through the first quarter of 2009. The Court

grants Plaintiff summary judgment.

### 4. Visual Monitoring Requirement

The 2002 Modified General Permit required Defendant to conduct several types of visual monitoring. The permit required visual monitoring of stormwater discharges each quarter at the location of stormwater sampling, and all discharge locations that were not sampled were to be visually inspected at least annually during a storm event. (Dkt. No. 74-3 at 27.) Those inspections were to monitor for various discharge characteristics and to determine whether the SWPPP was accurate, current, properly implemented, and adequate. (*Id.*) The permit also required a dry season inspection each year to determine if any non-stormwater discharges were present in the stormwater system. (*Id.*) The permit required the results of all visual monitoring to be recorded in a report signed by the person making the observations and then reviewed by a "duly authorized representative," including a certification by that person that the facility was in compliance with the SWPPP and the permit. (*Id.* at 27–28.) Additionally, the permit required Defendant to retain those records for a minimum of five years and throughout the course of any litigation. (*Id.* at 29.)

Plaintiff alleges that Defendant violated the permit by failing to visually monitor its discharges and/or by failing to document such monitoring in the fourth quarter of 2005 and the third quarter of 2006. (Dkt. No. 73 at 18.) Defendant testified that Exhibit 56 from the deposition included all of its visual monitoring records. (Dkt. No. 75-6 at 140–41.) Yet a visual monitoring report is missing for the fourth quarter of 2005 and the only monitoring report for the third quarter of 2006 does not include any indication that visual monitoring occurred. (*See* Dkt. No. 75-3 at 2–47.) Defendant does not respond to these allegations and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). Accordingly, the Court grants Plaintiff summary judgment that Defendant violated the permit by failing to conduct and/or document visual monitoring during the fourth quarter of 2005 and the third quarter of 2006.

Plaintiff also contends that Defendant violated the permit by failing to monitor each of its

discharge locations at least once annually during a precipitation event in 2005, 2006, 2007, 2008, and 2009. (Dkt. No. 73 at 18.) Plaintiff supports its allegation with Defendant's deposition testimony that indicates that Defendant has no documentation of the monitoring of every catch basin in its facility in 2005 through 2009, as well as Defendant's visual monitoring records, which do not include any evidence of inspections of each catch basin occurring. (Dkt. No. 75-6 at 132, 134–35, 137, 139–40; Dkt. No. 75-3 at 2–47.) It is apparent that Plaintiff is interpreting the permit's requirement to monitor every "discharge location" to mean that Defendant was required to monitor every catch basin. However, Defendant contests that definition and the permit does not further define the phrase. A dispute of fact exists, so the Court declines to grant summary judgment.

Plaintiff further alleges that Defendant violated the permit by not conducting the required dry season inspection in 2008 and 2009. (Dkt. No. 18.) As evidence, Plaintiff points to Defendant's deposition testimony that it has no documentation indicating that the dry season inspections occurred in 2008 or 2009. (Dkt. No. 75-6 at 136, 138.) Defendant contests this allegation, saying that dry season inspections were conducted, but Defendant does not cite any evidence or documentation to support its position. (Dkt. No. 82 at 12.) Defendant failed to meet its burden of showing that a genuine factual dispute exists. The Court grants summary judgment.

Plaintiff alleges that Defendant violated the permit because Defendant's visual monitoring records are signed only by outside consultants and not by a person as specified by the permit. (Dkt. No. 73 at 18.) Defendant does not rebut this allegation. The Court grants summary judgment.

### 5. Adaptive Management Requirements

The permit required differing levels of response—Level One, Two, or Three—if quarterly sampling results were above a benchmark value or parameter. (*See* Dkt. No. 74-3 at 17–30.) At a Level One Response, the permit required an inspection of the facility to: (1) evaluate possible sources of the benchmark parameter; (2) evaluate source control and

operational control methods to reduce stormwater contamination; and (3) evaluate whether any improvements or changes of the SWPPP were warranted. (*Id.* at 25.) The permit required that the results of the inspection, including any remedial actions taken, be summarized and placed in the SWPPP. (*Id.*)

A Level Two Response required the permittee to: (1) promptly identify the potential sources of contamination; (2) investigate all available options of source control, operational control, and stormwater treatment BMPs to reduce contamination levels to below benchmark values; (3) implement additional source control and operational BMPs identified; (4) prepare a level two source control report outlining actions taken, planned and any scheduled; and (5) submit the report to Ecology within six months. (*Id.* at 19.)

A Level Three Response required the permittee to: (1) promptly identify the potential sources of contamination; (2) investigate all available options of source control, operational control, and stormwater treatment BMPs to reduce stormwater contaminate levels to or below the benchmark values; (3) implement additional source control, operational control, and stormwater treatment BMPs identified as part of the investigation within twelve months of initiating the response; (4) prepare a level three source control report outlining actions taken, planned, and scheduled, and (5) submit the report to Ecology within twelve months. (*Id.*) The permittee could request a waiver from employing stormwater treatment BMPs, but the waiver had to be submitted to Ecology within three months of initiating the response and had to include an explanation of why the BMPs were infeasible and not necessary for compliance. (*Id.* at 19–20.)

### a. First Quarter of 2006

Plaintiff alleges that Defendant triggered the Level One Response for the first quarter of 2006, but that Defendant violated the permit by not fulfilling the Level One Response requirements. (Dkt. No. 73 at 20.) Plaintiff alleges that Defendant violated the permit because it did not include a summary in its SWPPP of the additional BMPs it implemented as a result of the Level One Response. (Dkt. No. 73 at 20.) Defendant does not respond to this allegation and has

not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants summary judgment.

Plaintiff further alleges that Defendant violated the permit because the letter to Ecology describing its Level One Response actions was not signed in accordance with the permit requirements. (Dkt. No. 73 at 20.) The permit requires that all information sent to Ecology be signed and certified by the appropriate authority. (*See* Dkt. No. 74-5 at 2–3.) The letter to Ecology is signed by an outside consultant who was not a "duly authorized representative." (*See* Dkt. No. 75-5 at 2.) However, the letter is not purported to be from Defendant, and the Level One Response makes no indication that Defendant was required to send a letter to or notify Ecology at all beyond including results in its SWPPP. Accordingly, the Court denies Plaintiff summary judgment.

### b. Third Quarter of 2007

Plaintiff alleges that Defendant triggered a Level Two Response in the third quarter of 2007, but that Defendant did not comply with the permit requirements. (Dkt. No. 73 at 21.) Plaintiff alleges that Defendant violated the permit by not including in its SWPPP the additional BMPs, such as increased inspection frequency and increased sweeping, it stated in its letter that it was going to implement as a result of the Level Two Response. (Dkt. No. 73 at 21.) Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff summary judgment.

Further, Defendant testified that "available information" indicates that it did not actually implement the sweeping BMP, as it stated it would do in its letter to Ecology. (Dkt. No. 75-6 at 156.) Plaintiff alleges that Defendant thus violated the permit by not implementing its Level Two Response. (Dkt. No. 73 at 21.) However, Defendant maintains that it directed its maintenance shop personnel to increase sweeping frequency and cites to its deposition testimony indicating that such a request was made. (Dkt. No. 75-6 at 156.) A factual dispute exists. The Court denies summary judgment.

1    Plaintiff alleges that Defendant further violated the permit by failing to investigate stormwater treatment BMPs as part of its Level Two Response. (Dkt. No. 73 at 21.) Defendant's testimony indicated that it did not investigate that possibility. (Dkt. No. 75-6 at 155.) The permit specifically requires such an investigation in Level Two Responses. (Dkt. No. 74-3 at 19.) Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff summary judgment.

Plaintiff further alleges that Defendant violated the permit, because the letter sent to Ecology regarding the Level Two Response was not signed in accordance with permit requirements. (Dkt. No. 78 at 21.) However, as before, the letter is not purported to be sent by Defendant and the permit does not require Defendant to send a letter to Ecology. Instead, Defendant was required to send a source control report to Ecology within six months of initiating the Level Two Response. Plaintiff does not allege that the source control report was improperly signed. The Court denies summary judgment.

### c. Fourth Quarter of 2007

Plaintiff alleges that, in the fourth quarter of 2007, Defendant triggered a Level Two Response for copper and lead and a Level One Response for turbidity and zinc, but that Defendant failed to comply with these requirements. (Dkt. No. 73 at 22.) Plaintiff alleges that Defendant's letter to Ecology that it claims described its fulfillment of the response requirements was deficient in meeting the Level Two Response requirements for copper and lead. (*Id.*) Plaintiff asserts that the letter only acknowledges that the facility is at a Level Two Response for copper and lead, but that Defendant made no effort to identify the sources of copper and lead contamination as required by the permit. (*Id.*) The letter mentions that an elevated metals concentration might be the result of the removal of a filter and increased sweeping. (*See* Dkt. No. 75-5 at 7–8.) Defendant maintains that those statements applied to the copper and lead levels, and, thus, the letter identified the sources of contamination. (Dkt. No. 75-6 at 159–61.) A factual dispute exists, and the Court declines to exercise summary judgment.

Plaintiff also asserts that Defendant failed to investigate stormwater treatment BMPs as the permit required for a Level Two Response. (*Id.*) Plaintiff points to Defendant's deposition testimony, where Marsi Beeson states that, based on the available documents, Defendant did not investigate the possibility of stormwater treatment BMPs. (Dkt. No. 75-6 at 163.) Defendant does not respond to this allegation and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants Plaintiff summary judgment.

Plaintiff asserts that Defendant actually removed a BMP rather than implementing additional BMPs during its Level Two Response. (Dkt. No. 73 at 22.) The BMP removed was a catch basin filter. (*Id.*) Defendant maintains that it removed the filter because, when the filter was regularly removed for sampling, it disturbed the collected sediment and biased the sample results. (Dkt. No. 82 at 18.) Defendant states that it removed the one filter in an effort to secure more accurate sample results. (*Id.*) A factual dispute exists as to whether this violated the permit. The Court declines to exercise summary judgment.

Plaintiff also alleges that Defendant violated the permit by having Marsi Beeson sign the letter to Ecology. (Dkt. No. 73 at 22.) Ms. Beeson was not a duly authorized representative of Defendant. (Dkt. No. 75-6 at 158.) Accordingly, the Court grants summary judgment that Defendant violated the permit by having only Ms. Beeson sign the letter to Ecology.

### d. First Quarter of 2008

Plaintiff alleges that, in the first quarter of 2008, Defendant triggered a Level Three Response for turbidity and zinc and a Level One Response for copper and lead, but that Defendant made no effort to comply with the permit requirements for those responses. (Dkt. No. 73 at 23.) A Level Three Response explicitly requires implementation of additional BMPs. (Dkt. No. 74-3 at 19.) Stormwater treatment BMPs were required unless the permittee requested and Ecology granted a waiver. (*Id.*) Plaintiff alleges that Defendant failed to conduct any evaluation or implementation whatsoever of additional operational, source control, and treatment BMPs as part of its Level Three Response to reduce contamination of discharge. (*Id.*) Plaintiff points to

Defendant's letter to Ecology that makes no mention of the investigation or implementation of additional BMPs. (Dkt. No. 75-5 at 10–11.) Additionally, Defendant's deposition testimony indicates that it did not investigate additional BMPs after the Level Three Response. (Dkt. No. 75-6 at 169–70.) Additionally, Defendant did not request a waiver from employing stormwater treatment BMPs. (Dkt. No. 75-6 at 172.) Defendant does not respond to these allegations and has not shown that a genuine issue for trial exists. *See* Fed. R. Civ. P. 56(e)(2). The Court grants summary judgment.

Plaintiff alleges that Defendant violated the permit because only Marsi Beeson signed its letter to Ecology. (Dkt. No. 75-5 at 10.) Ms. Beeson was not a duly authorized representative of Defendant. (Dkt. No. 75-6 at 158.) Accordingly, the Court grants summary judgment that Defendant violated the permit by having only Ms. Beeson sign the letter to Ecology.

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's first motion for partial summary judgment (Dkt. No. 72) and GRANTS IN PART and DENIES IN PART Plaintiff's second motion for partial summary judgment (Dkt. No. 73.)

DATED this 19th day of August 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE